10-CV-0346-WQH

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   LUIS DEL RIO, Individually and on   .
     Behalf of All Others Similarly      .
 5   Situated,                           . No.  10-CV-0346-WQH
                                         .
 6        Plaintiff,                     . May 17, 2010
                                         .
 7            v.                         . 11:00 a.m.
                                         .
 8   CREDITANSWERS, LLC,                 . San Diego, California
                                         .
 9        Defendant.
     . . . . . . . . . . . . . . . . . .

10

11

12
                     TRANSCRIPT OF MOTION HEARING
13              BEFORE THE HONORABLE WILLIAM Q. HAYES
                     UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16   For the Plaintiff:      Hyde & Swigart
                             By:  DAVID C. LEIMBCH, ESQ.
17                           411 Camino del Rio South, Suite 301
                             San Diego, California 92108
18
     For the Defendant:      Gordon & Rees LLP
19                           By:  KEVIN W. ALEXANDER, ESQ.
                                  YAARA L. ELISHA, ESQ.
20                           101 West Broadway, Suite 1600
                             San Diego, California 92101
21

22
     Court Reporter:         Melinda S. Setterman, RPR, CRR
23                           880 Front Street, Room 4290
                             San Diego, California, 92101
24

25   Reported by Stenotype, Transcribed by Computer
```

10-CV-0346-WQH

```
              1        SAN DIEGO, CALIFORNIA, MAY 17, 2010, 11:00 A.M.

              2                              * * * *

              3             THE CLERK:  Number 12 on calendar, case 10-CV-346, Del

              4      Rio vs CreditAnswers LLC, on for motion hearing.

      11:01   5             THE COURT:  Please enter your that appearances,

              6      counsel.

              7             MR. ALEXANDER:  Good morning, Your Honor.  Kevin

              8      Alexander for defendant, CreditAnswers.

              9             MS. ELISHA:  Good morning, Your Honor.  Yaara Elisha

      11:01  10      for CreditAnswers.

             11             THE COURT:  Good morning.

             12             MR. LEIMBACH:  David Leimbach for Del Rio.

             13             MR. HYDE:  Robert Hyde on behalf of plaintiffs Del

             14      Rio.

      11:02  15             THE COURT:  Good morning.

             16             MR. HYDE:  Good morning.

             17             THE COURT:  Counsel, the matter is on for defendant's

             18      motion.  Do you wish to be heard?

             19             MR. ALEXANDER:  If I may.

      11:02  20             THE COURT:  Okay.

             21             MR. ALEXANDER:  Your Honor, we've briefed the issue, I

             22      think, in a very thorough manner, so I'll be brief.  A few

             23      points, though, I think are worth mentioning.

             24             In reading these cases, it becomes very clear there

      11:02  25      are multitude of cases and I think the reason it is on a
```

 1    fact-by-fact basis.  Each cases have a different set of

 2    circumstances each cases has a different agreement.  We have

 3    recently, just within the last two weeks, had a US Supreme

 4    Court case that I believe is of relevance.  It is the

11:02     5    Stolt-Nielsen decision we mentioned.

 6        In the Supreme Court decision, the US Supreme Court

 7    determined that consent is the primary factor that the parties

 8    should be looking at in these arbitration provisions.  That

 9    case involved a binding arbitration provision which did not

11:03    10    mention class waivers or class actions, period.  They were

11    silent on the topic.

12        In the lower courts referred the matter to binding

13    arbitration of a class action.  The Supreme Court said, no,

14    there has to be consent.  That is the premise behind the FAA.

11:03    15        In our case, our provision is not silent with respect

16    to class actions in arbitration, so we have that consent.  In

17    that I believe is a very relevant factor because the Supreme

18    Court said look to the Court premise.  Have the parties reached

19    an agreement on the topic?  If they haven't we'll not push it

11:03    20    to arbitration because it is a different kind of case.  It is

21    complicated.

22        In a situation like this we do have the agreement.

23        THE COURT:  Is that the issue here, consent?

24        MR. ALEXANDER:  I believe so, in some ways, yes.

11:03    25    Mr. Del Rio submitted a declaration that he did not consent.

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:04 | 5 |

1    My respectful response would be that he had an opportunity to

2    read the agreement.  He signed it without any claim that he

3    didn't sign it.  He had a ten-day provision within which he

4    could walk away from the agreement.  Something that is very

11:04    5    relevant from a procedural and conscionability standpoint and

6    is entirely absent in most of the cases that have been

7    discussed here.

8         So what the Supreme Court I think is saying is that

9    you can have arbitration waivers.  The California Supreme Court

11:04    10    in the Discover Bank case has said class waivers are not per se

11    unconscionable.  So absent putting blood to paper, there has to

12    be some form of agreement that is acceptable, and I

13    respectfully submit that we have one here because we have the

14    signature by Mr. Del Rio.  He didn't claim that he didn't

11:04    15    understand the language.  He didn't claim he couldn't read the

16    language, and he didn't claim that the ten-day period was

17    forced upon him and he really only had one day.

18         He simply claimed that he didn't agree to it.  But I

19    think by his signature we have to assume under the law that he

11:05    20    did agree to the terms.

21         The arbitration provision is at issue is fairly

22    simple.  It states that all provisions -- or all disputes are

23    subject to binding arbitration.  Contrary to the suggestion in

24    the opposition papers that makes, I guess, the argument that it

11:05    25    would be expensive and prohibitively expensive for Mr. Del Rio

```
 1  fly to Texas.  The arbitration states that it can be conducted
 2  by Triple A in either Texas or the state of residence or county
 3  of the residence of plaintiff.  Mr. Del Rio is a resident of
 4  San Diego County.  I believe that is undisputed.
 5        So, again, absent is the unconscionability that might
 6  exist in requiring somebody to fly across the country.  We have
 7  placed a $1,000 cap in our provision by its terms.  In our
 8  reply brief we set forth that we're even willing to waive the
 9  $1,000 cap.
10        My client is a business.  Like any others, they want
11  to get issues resolved.  Under the laws of the state of Texas
12  there is really no dispute that this provision would be
13  enforceable.  There are numerous cases that have indicated that
14  it would be.
15        Now, I readily acknowledge that there are many more
16  cases in the Ninth Circuit that have challenged these
17  provisions in a much greater way.  But when you look at those
18  factors, that is the Discover Bank analysis, case-by-case
19  basis, I respectfully submit that those factors have not been
20  met by Mr. Del Rio, and there are three of them.
21        Two of them I will address now.  To establish
22  unconscionability this has to involve a contractual setting
23  that is typical to disputes involving small sums of money.
24  Now, if we look at the case law, we see cases talking about
25  $25, $29 which was Discover Bank, all the way up to 2-, 3-,
```

11:05

11:05

11:06

11:06

11:06

1    $4,000 in the most recent case in the Ninth Circuit case, which

2    was the Omstead case, Mr. Del Rio indicates that he's reached

3    damages in excess of $5,000 including actual damages, attorney

4    fees, punitive damages.

11:07   5    He alleges a CAFA required $5 million cap or $5

6    million threshold for purposes for Class Action Fairness Act.

7    We're not talking about small sums of money, nor has Mr. Del

8    Rio alleged that.  He simply hasn't alleged it.

9    THE COURT:  Is Omstead binding authority?

11:07   10    MR. ALEXANDER:  I don't believe so.  I think there are

11    so many decisions.  It is the most recent authority.  Is it

12    binding?  No.

13    THE COURT:  And why -- in your reply you indicated it

14    is not binding, but why is it not binding?

11:07   15    MR. ALEXANDER:  Sure.  Because each case is fact

16    specific.  The law -- Discover Bank is the law.  That is the

17    law of California.  That is where we look, and that is pretty

18    much what Omstead does.  It applies it to those facts.

19    In my point would be that this was a requirement at

11:07   20    contract inception online to check a box, "I accept the terms

21    and conditions."  Mr. Del Rio's situation was different.  He

22    received a contract that he had ample opportunity to review.

23    He didn't have to sign it at that time or any time later.

24    He did.  He submitted it in an electronic signature,

11:08   25    not a check-the-box "I agree."  He wrote his signature in, and

1    he had a ten-day window within which to cancel if he didn't

2    agree.

3              THE COURT:  Is that the distinction that you are

4    drawing between the two cases, that one was check the box and

11:08  5    that the other one was a signature?  Is that the --

6              MR. ALEXANDER:  That is one of the distinctions, and I

7    will respectfully point out what I think is a flaw in the

8    Omstead decision.  It is a very short decision, but it is an

9    obvious flaw.  The Ninth Circuit does not apply the Discover

11:08  10   fact requirements.  They are very clear.  They are spelled out

11   in the footnote that -- the third requirement says, "It is

12   alleged that the party with superior bargaining power has

13   carried out a scheme to deliberately cheat large numbers of

14   consumers out of individually small sums of money."

11:08  15         The Omstead decision does not apply that.  What it

16   does, actually, is say that in very brief fashion, that they

17   alleged a deliberate practice of defrauding consumers of money.

18   It doesn't talk about small sums of money, which is the key

19   distinction here with this case, again, Mr. Del Rio alleging

11:09  20   more than $5,000 in damages on his own claim.

21             So I think that if you read the decision, and I

22   suspect the Court has, it is very cursory, it does not really

23   add any depth to the analysis.

24             THE COURT:  Even if it may be cursory, isn't in

11:09  25   your -- is the Court required to follow it?

1    MR. ALEXANDER:  I think so.  I think this is the Ninth

2    Circuit that we stand within and most definitely, but following

3    it does not lead to the conclusion that this motion should be

4    denied because it is a fact-specific analysis.

11:09  5    There was not a -- specifically, this is a claim that

6    at most which involved $1,500 to $4,000 in damage.  They have

7    alleged in excess of five.  They have come back with no

8    evidence, which it is their obligation in opposition to say

9    their claim is not for a small sum of money.

11:10  10   THE COURT:  In Omstead didn't they specifically then,

11   though, accept the analysis in, I guess, would be referred to

12   as Ostriker 1, the unpublished opinion?

13   MR. ALEXANDER:  Yes.

14   THE COURT:  Which was sum $4,000, I believe, right?

11:10  15   MR. ALEXANDER:  I believe so, yes.

16   THE COURT:  So is it fair to say that the Omstead

17   decision, whether it is cursory or fraud, does stand for the

18   position that $4,000 is not -- or $4,000 amount with respect to

19   the sum is similar to the earlier cases that talked about, you

11:10  20   know, 25, 1500, $1,600, some of the other district court cases

21   that you relied on?

22   MR. ALEXANDER:  They certainly found in this instance

23   that $4,000 was sufficient to meet the requirement.  Again, my

24   main point being that they don't allege 4,000; they don't

11:10  25   allege 5,000; they in their own words allege more than 5,000,

1  so they have an obligation to put forth evidence and that their

2  claim is within the province, and they haven't done so.

3       They also have a separate obligation to allege

4  basically what I indicated as a third factor, and they cited --

11:11  5  and I will refer the Court to their citation.  They have cited

6  to a number of paragraphs in the claim alleging that they've

7  complied with the requirement, and they cite to paragraphs 24

8  through 31, 77, and 79.  Nowhere in those paragraphs in the

9  complaint is it alleged that a party with superior bargaining

11:11  10  power carried out a scheme to deliberately cheat large numbers

11  of consumers out of small sums of money.  It is not there.  And

12  I would respectfully submit that the third factor has not been

13  met, as well as the second.

14       I mentioned the procedural unconscionability aspect,

11:11  15  and most of the cases, particularly the cases early on, dealt

16  with that contract amendment that would be made maybe

17  three years, four years, a year after the actual agreement was

18  made.  These might be telephone type contracts which you get

19  something in the mail, a mail stuffer case.  This is not a mail

11:12  20  stuffer case.  This is a contract that was bargained for at --

21  in June of 2009, and the terms contain a clear provision which

22  states that arbitration is the remedy, and there shall be no

23  class arbitration.

24       My final point, because I think we have briefed the

11:12  25  issue very well, is that there is no real dispute that the

1    issues alleged in the complaint fit within the arbitration

2    provision.  It is a broad-base provision, says all disputes

3    shall be arbitrated.

4           There is some factual issues I can certainly address,

11:12  5    which I think have either stretched slightly or misstated, but

6    I can address those in response if need be, but those are my

7    core points.

8           THE COURT:  Thank you, counsel.

9           Mr. Leimbach.

11:12  10    MR. LEIMBACH:  Yes, sir.

11           THE COURT:  All right.

12           MR. LEIMBACH:  I would really like to just kind of

13    address the points he brought up.  The main points like he

14    said, were pretty much briefed well enough.

11:13  15           In regards to the Stolt-Nielsen decision, my

16    understanding is that the thrust of the case really just deals

17    with when an arbitration clause is silent on whether or not

18    class arbitration is warranted, that it is not.  It doesn't

19    really have any bearing on the issue of class action waivers or

11:13  20    unconscionability, which is the main point here, so there is

21    really not a whole lot of relevance to the decision as far as

22    the unconscionability analysis here.

23           I'll admit there are some other collaterals issue.  We

24    still submit that claims for injunctive relief, claims brought

11:13  25    under the CLRA, Consumer Legal Remedies Act, and the unfair

1   competition law that they are not subject to arbitration, and

2   there is case law standing for the proposition that you can't

3   waive those kinds of statutory protections of these private

4   Attorney General actions.

11:13   5          But I'll agree that the main issue here is the

6   Discover Bank test and whether or not it is substantively

7   unconscionable under those three prongs.  The first one, it is

8   clearly a contract of adhesion, so I won't spend much time on

9   that.

11:14   10         But getting to what he was saying, first, about the

11  issue of damages, in our opposition we claimed that the typical

12  amount of damages at issue are the service fees.  Those are

13  going to be between $500 and $3,000, usually not more than

14  that.  And our client's case I believe it was about $2,300.

11:14   15         They were referring to the $5,000 amount as to our

16  complaint that we had filed.  That is inclusive of everything,

17  punitive damages for the tort claims and the negligence claims.

18         But for the purposes of what the damages, what the

19  monetary value of damages are for this class action waiver, you

11:14   20  are dealing with a service fees, the actual damages, so in most

21  instances they will be less than $3,000.  That is amount, time

22  and time again in all the state court cases has been found

23  sufficient.  State court cases, at least California state court

24  cases are legion that these type of class action waivers are

11:15   25  unconscionable.

1          In federal court the issue kind of seems to come down

2    to Central District versus the Northern District.  The two

3    cases they cited where they found that the class action waivers

4    were valid have been expressly rejected in any courts that have

11:15    5    addressed them.

6          The Northern District's case, as Your Honor was

7    pointing out earlier that seems to be the most on point, is the

8    Ninth Circuit's case in Omstead which adopted the reasoning of

9    Ostriker 1.  So even so -- if, assuming for now that the

11:15   10    damages issues are between 500 and $3,000, that expressly fits

11    within what the Ninth Circuit has ruled on.

12          So -- and while I agree that the Omstead decision is

13    not controlling in the sense that, yes, all class action

14    waivers are per se unenforceable, the fact that they found the

11:15   15    $4,000 is sufficient to meet the Discover Bank test.  It should

16    be controlling on that issue.

17          So even if we were to accept the $5,000, it would seem

18    to a bit tenuated to suggest that $4,000 is sufficient to meet

19    Discover Bank but $5,000 is not.  And, sure, it is controlling

11:16   20    on the particular issue of the damages meeting the Discover

21    Bank test.

22          THE COURT:  5,000 would be by far the largest amount,

23    correct, that has been found to satisfy that?

24          MR. LEIMBACH:  They didn't actually apply the Discover

11:16   25    Bank test in the -- I'm sorry.  Let's see.  There is actually

11:16

11:17

11:17

11:17

11:17

11:18

1    an extreme example of a court finding that a ban on

2    consolidated claims in Independent Association of Mailbox

3    Owners vs Superior Court, 133 Cal Ap 4th 396, in 2005.  This

4    was about 30 franchises, and they were all bringing claims for

5    around $470,000, and even there the Court refused to enforce

6    the ban on consolidated class arbitration proceedings.

7         So I will admit in the consumer context that if we

8    were to accept $5,000 as the amount of issue and not the actual

9    damages as less than 3,000, it would be the most that the Court

10   has found, meaning the Discover Bank test, but again, that

11   would include other damages that are punitive, more

12   speculative, not the actual damages.  And these cases, they

13   dealt with the actual damages.  They dealt, in the Omstead and

14   Ostriker, they dealt with the actual purchase price of the

15   computers, so those are the damages we should be looking at.

16        And then as far as the not literally pleading carried

17   out a scheme to commit a fraud on a number, I can't imagine

18   that is what the intended -- that is what was intended by the

19   Discover Bank opinion or any other cases that followed it.

20   They never came out and said that you need to plead this

21   magical phrase to qualify for the Discover Bank test.

22        In fact, that would kind of go against a great deal of

23   federal authority that says it really is pro form to just

24   regurgitate the elements of a crime or regurgitate the elements

25   of a civil cause of action.  The point is, in substance are the

10-CV-0346-WQH

```
      1    allegations there?

      2         So when we cited to those paragraphs in our first

      3    amended complaint we are alleging that the defendant has

      4    carried out a scheme to misrepresent the nature of the

11:18 5    services, the quality of services, what services they perform,

      6    and by the time the consumers realize it, it is too late.

      7         And in viewing the magic phrase that was used in

      8    Discover, no, but there is nothing in any authority to suggest

      9    that would be required.

11:18 10        So, I mean, it really -- I think ultimately what we're

      11   arguing here, the main issue seems to be the amount of damages

      12   at issue, and the if $4,000 is enough, certainly it would be

      13   controlling if the Court would accept 500 to $3,000.  And if

      14   the Court is going to see it as $5,000, it would just seem a

11:19 15   stretch to say that four is okay but five is not.

      16        And just one last point on the damages --

      17        THE COURT:  Although, at some point there has to be

      18   some point where it is going to be too much.

      19        MR. LEIMBACH:  Absolutely, Your Honor.

11:19 20        THE COURT:  At what point is that?

      21        MR. LEIMBACH:  And I think -- I think the reasoning

      22   that someone would -- that the Courts would be instructed to

      23   get to that conclusion, is it worth it -- or is it going to be

      24   worth it for them to pursue individual damages?  And I think

11:19 25   that is why the Discover Bank court never came up with what a
```

1   hard-line rule is.  Opposing counsel is correct, that it is a

2   fact by -- fact-specific inquiry, so look at the circumstances.

3           Is there going to be an incentive for these people to

4   pursue the claims?  We're talking about consumers who, know

11:19   5   you, they are at their financial whits end; they can't barely

6   afford to make minimum payments on their credit cards; and they

7   are required to pay thousands of dollars to get any services.

8           There is no statute or law that allows for attorney's

9   fees to sue for any of these cases, and in fact, the only way

11:20   10   that an attorney could represent these type of people would be

11   in a class action capacity and see attorney fees later on if

12   successful under the relief -- injunctive relief for public

13   good, so basically we are dealing with actual damages around

14   $2,000.  It simply wouldn't seem to make sense for someone to

11:20   15   pay an attorney a $2,000 retainer fee to try and go after a

16   company for $2,000.  You'll lose money on the filing fee alone.

17           I think it comes down to where do we draw the line?

18   And we draw the line and say, well, will they be able to pursue

19   a remedy in an individual capacity and do they have any

11:20   20   incentive to do it?  And if you look at it and you say it is a

21   small amount of damages, chances are most people won't pursue a

22   remedy because it is just not economically viable, I think that

23   is what meets what -- the intended meaning of the Discover Bank

24   test.

11:20   25           And if I could make one last point.  We submit all the

1   elements are clearly met in the Discover Bank test, but even

2   assuming some may be met more than others or less than others,

3   the Ninth Circuit opinion in that Schroyer vs New Singular

4   Wireless Services, 498 F.3d 976, 2007, they made very clear

11:21   5   that not all the elements have to be met.  And, in fact -- let

6   me find their language.

7        The language essentially was, there are surely

8   circumstances where class action waivers, especially in

9   consumer contracts, are going to be unconscionable even though

11:21   10   all the elements of the Discover Bank test haven't been met,

11   and then they just said, but they are all met here.

12        So even if some may appear to be met more than others,

13   based on the nature of that settlement operation, the way the

14   structure works by applying the service fees thousands of

11:21   15   dollars at a time, the clear incentive that there would be no

16   reasonable consumer that is willing to spend just as much money

17   in a retainer fee for an attorney to pursue a small service

18   fee, these are the kind of circumstances that Schroyer was

19   talking about.

11:22   20        THE COURT:  Thank you.  Have you completed your

21   remarks?

22        MR. LEIMBACH:  Yes.

23        THE COURT:  Thank you, sir.

24        Mr. Alexander.

11:22   25        MR. ALEXANDER:  With respect to the Stolt-Nielsen

1    decision, it is, in my view, going to have a broad impact.  At

2    least one case also pending before the Supreme Court, which we

3    looked up anticipating this argument might be made, has been

4    remanded.  It is the American Express --  what is called

11:22    5    American Express emergence litigation.  It did involve a

6    situation much more similar to this one where you had a new

7    arbitration class provision, binding arbitration, no class

8    allowed in the arbitration.

9        That decision, which is at 554 F.3d 300, was remanded

11:23    10    to the Second Circuit, indicating to rule consistent with the

11    Supreme Court decision in Stolt-Nielsen, so I think the Supreme

12    Court, at least in its mind, has issued its primary directive

13    which is focused on consent, and that will leave the Second

14    Circuit to determine whether there was consent in that waiver

11:23    15    of a class arbitration provision, but, again, here I think we

16    have that consent.

17        My main point, simply responding to counsel's

18    comments, would be that there still is the lack of evidence

19    that the claims constitute a sufficiently small sum of money.

11:23    20    Counsel mentioned, I think, 300 to $3,000 or 500 to $3,000.

21    There is no evidence on that.  There is some language that

22    counsel asserts to in, I think, his opposition brief by

23    counsel, but there is no evidence from Mr. Del Rio or from

24    anyone else that that is, in essence, what this case is about.

11:24    25        Mr. Del Rio has alleged $5,000.  He's seeking in

1    excess of 5,000.  Whether that means 50,000, 100,000, I am not

2    sure what it means, but it is his obligation to put forth that

3    to this Court and have it done.  They just presented that they

4    think a larger group of class may have a smaller claim, but

11:24    5    that is not my burden.  That is his burden.

6              So, thank you, Your Honor.

7              THE COURT:  Thank you.

8              Mr. Leimbach, I'll give you an opportunity to respond

9    to the last point.  Where in the record is it that it is

11:24    10   between 500 and 3,000?  Because I heard your argument say,

11   well, it is really between 500 and 3,000, and counsel's

12   argument, Mr. Alexander, is saying really it is 5,000 or more

13   than 5,000.

14             And so from your view is it, you've indicated

11:24    15   certainly from your papers, I think, that Omstead controls, and

16   that certainly Omstead by accepting the reasoning in Ostriker 1

17   where 4,000 was -- satisfied the test, then you fall within the

18   four -- you fall within Ostriker 1.

19             Where is the evidence in the record that you fall

11:25    20   within Ostriker 1?

21             MR. LEIMBACH:  Yes, Your Honor.  In the terms of the

22   contract that demonstrated what the service fees were, those

23   show what the service fee payment schedule was, and it showed

24   that the service fees were, I believe for our client, I forget

11:25    25   the exact amount, it was probably around $2,300.

1           And the thing is, without -- for the class members, as

2      far as they are concerned, there is no, obviously, record of

3      their actual damages yet because we haven't been able to engage

4      in class discovery.  But it can really be easily inferred just

11:25  5      by the nature of the operation.  They require a 15 percent

6      service fee paid at the outset, in the structured settlement,

7      over the 15 months of the settlement program.

8           So consumers are typically -- unless you are assuming

9      that consumers are submitting, you know, $200,000 in unsecured

11:26  10     credit card debt, the typical class rep, like our client, he

11     submitted around 25- to $30,000, he submitted 15 percent of

12     that, that is the amount of actual damages at issue.  But we

13     don't have evidence or hard evidence of what the class' damages

14     are, it can really easily be determined by the service contract

11:26  15     and our client's actual damages, which should be the amount at

16     issue for this --

17           THE COURT:  Where in the record is your client's

18     actual damages?  Your client's actual damages are what?  You

19     are alleging between -- you are saying in argument they are

11:26  20     between 500 and 3,000?

21           MR. LEIMBACH:  Yes.  I don't have the exact number on

22     me, but I believe the service fees he paid were about $2,300.

23     I can't be a thousand percent, but I am almost positive it is

24     in that ballpark.

11:26  25           THE COURT:  Your position is that is the amount the

1  Court should consider in applying the Discover Bank test,

2  between 500 and 3,000?

3      MR. LEIMBACH:  Yes, Your Honor.  The Omstead case and

4  Ostriker case and all the other cases mainly dealing with

11:27  5  purchasing computers over the Internet, what they are alleging,

6  they are focusing on the actual damages.  What is the amount

7  paid for and what is the sustainable loss?

8      And that is what we're dealing with here.  The service

9  fee is the actual damages.  Anything in excess of that would

11:27  10  just be punitive damages that we would be seeking under our

11  negligence and tort claims.

12      THE COURT:  Any final comment, Mr. Alexander, in

13  response to that claim?

14      MR. ALEXANDER:  Yes.  I did find one page which I

11:27  15  think will assist the Court in its analysis.  On page three of

16  the contract, the CreditAnswers contract, there is a grid which

17  sets forth the total amount of service fees and maintenance

18  fees.

19      Assuming Mr. Del Rio stayed in the program through the

11:27  20  end of the program, for Mr. Del Rio on $35,213, that adds up to

21  4225 in service fees and 2397 in maintenance fees, so you are

22  over $6,600 on a $35,000 amount in debt.

23      If you have 100,000, you know, you are looking at

24  probably you know almost triple that.  If you are looking at a

11:28  25  million dollars times ten.

|   |   |
|---|---|
|  | 1 |

      1     So you can see how this could increase substantially

2  dependent upon the type of claim.  Mr. Del Rio is one person,

3  but his total amount of service fees and maintenance fees by

4  this chart is $6,600.

11:28  5     THE COURT:  All right.  Thank you, sir.

6     All right.  Anything further, counsel?

7     MR. LEIMBACH:  One more.

8     THE COURT:  Very briefly, yes, sir.

9     MR. LEIMBACH:  To respond to that, I think one of the

11:28  10  main ideas is and we allege this in our complaint is that many

11  consumers, they don't realize the futility of the program until

12  they already paid a few thousand dollars, so the idea is they

13  are paying service fees and they are quitting the program.

14  They are not getting any benefit out of it.

11:28  15     So looking at the service fees and saying, well, let's

16  assume that everyone participated in the four-year program,

17  that simply is not the case.  In most instances -- in a lot of

18  instances, these consumers drop out of the program, so they are

19  only being deprived of a couple thousand dollars.

11:29  20     THE COURT:  Final argument?

21     MR. ALEXANDER:  Nothing further.

22     THE COURT:  Thank you, counsel.  Your briefing was

23  very helpful.  Your argument was helpful.  I'll issue a written

24  decision by the end of the day.

11:29  25     MR. HYDE:  Thank you, Your Honor.

1        (Recess at 11:29 a.m.)

2                          ---oOo---

3

4                  C-E-R-T-I-F-I-C-A-T-I-O-N

5

6        I hereby certify that I am a duly appointed, qualified

7   and acting official Court Reporter for the United States

8   District Court; that the foregoing is a true and correct

9   transcript of the proceedings had in the aforementioned cause;

10  that said transcript is a true and correct transcription of my

11  stenographic notes; and that the format used herein complies

12  with the rules and requirements of the United States Judicial

13  Conference.

14        DATED:  June 7, 2010, at San Diego, California.

15

16                        /s/ Melinda S. Setterman
                        _____
17                        Melinda S. Setterman,
                        Registered Professional Reporter
18                        Certified Realtime Reporter

19

20

21

22

23

24

25